UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

ALINE WATERMAN

CIVIL ACTION NO. 6:15-cv-02699

VERSUS

JUDGE DOHERTY

U.S. COMMISSIONER, SOCIAL
SECURITY ADMINISTRATION

MAGISTRATE JUDGE HANNA

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision be remanded for further

administrative action.

### ADMINISTRATIVE PROCEEDINGS

The claimant, Aline Waterman, fully exhausted her administrative remedies

before filing this action.  She filed applications for disability insurance benefits

("DIB") and supplemental security income ("SSI") in July 2011, alleging disability

beginning on May 18, 2011.[1]  Her applications were denied,[2] and she requested a

hearing, which was held in April 2012 before Administrative Law Judge Kim Fields.[3]

---

[1]     Rec. Doc. 8-1 at 211, 218.

[2]     Rec. Doc. 8-1 at 85,86.

[3]     The hearing transcript is found at Rec. Doc. 8-1 at 36-64.

The ALJ issued a decision in May 2012,[4] concluding that the claimant was not disabled within the meaning of the Social Security Act from May 18, 2011 through the date of the decision.  The claimant asked for review of the decision, and the Appeals Council vacated the decision and remanded the case for resolution of three specific issues.[5]  A second hearing was held in April 2014 before the same ALJ.[6]  In July 2014, the ALJ issued his second ruling, again finding that the claimant was not disabled from May 18, 2011 through the date of the decision.[7]  The Appeals Council denied her request.[8]  Therefore, the ALJ's decision became the final decision of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review of the Commissioner's decision.

## SUMMARY OF PERTINENT FACTS

The claimant was born on September 1, 1966.[9]  At the time of the ALJ's first decision, she was forty-five years old; and at the time of the second decision, she was

_____

[4]      Rec. Doc. 8-1 at 110-117.

[5]      Rec. Doc. 8-1 at 123-124.

[6]      Rec. Doc. 8-1 at 65-84.

[7]      Rec. Doc. 8-1 at 19-29.

[8]      Rec. Doc. 8-1 at 5.

[9]      Rec. Doc. 8-1 at 39, 75, 211, 218.

forty-seven.  She completed the tenth grade,[10] and has worked as a bartender and waitress, cashier, housekeeper, and teacher's assistant in a nursery school.[11]  She alleges disability since May 18, 2011[12] due to fibromyalgia, arthritis, thoracic spine pain, bulging discs, leaky heart valves, weak hands, arms, and elbows, frequent headaches, depression, and a sleep disorder.[13]

The medical records provided for review begin before the claimant's alleged onset date in May 2011.  A diagnostic study from October 2008 showed chronic inflammation of the esophagus.[14]  On April 14, 2009, the claimant saw Dr. Phillip V. McAllister of the Houma Neurosurgery and Spine Center, LLC in Houma, Louisiana, for neck pain radiating to her right arm and numbness in her right hand accompanied by loss of balance and blurred vision in both eyes.  She reported experiencing this pain for seven months, and rated it as varying from six to nine on a scale of one to ten.  She also reported a left carpal tunnel release surgery in 2007.  Palpation around the shoulders and rotator cuffs caused pain.  Because there were no objective indicators of the source of her pain, Dr. McAllister ordered an MRI of the cervical

---

[10]     Rec. Doc. 8-1 at 39, 75.

[11]     Rec. Doc. 8-1 at 39-40, 75-76, 276, 295.

[12]     Rec. Doc. 8-1 at 211, 218, 275.

[13]     Rec. Doc. 8-1 at 87, 97, 275.

[14]     Rec. Doc. 8-1 at 422-357.

spine, which was performed on April 16, 2009 and showed mild central canal narrowing at C4-5, mild left neural foraminal narrowing at C4-5 with mild bilateral neural foraminal narrowing at C5-6, and straightening of the normal cervical curve.[15] Dr. McAllister also performed a right carpal tunnel release on June 22, 2009.[16]

The claimant saw Dr. Brandon K. Hider at Ochsner Clinic on January 18, 2010 for low back pain.[17]  She reported back pain for the past couple of years with no causal trauma and claimed that her pain had been ten out of ten for four days.  She denied radiation, loss of bowel or urinary function, numbness, or tingling.  She had limited forward flexion, rotation, and extension due to pain.  She was given a Toradol injection and was prescribed Skelaxin (a muscle relaxant) and Percocet (for pain).

On August 10, 2010,[18] she returned to Dr. Hider complaining of left breast pain, radiating to her left arm and into her back.  He diagnosed costochondritis and prescribed Ultracet (for pain) and Nexium (for heartburn).  A week later,[19] the claimant returned seeking treatment for abdominal pain, but the treatment note is

---

[15]     Rec. Doc. 8-1 at 364-365.

[16]     Rec. Doc. 8-1 at 370-371.

[17]     Rec. Doc. 8-1 at 417-418.

[18]     Rec. Doc. 8-1 at 437-438.

[19]     Rec. Doc. 8-1 at 439.

incomplete.  On November 3, 2010,[20] she again returned, this time complaining of a sore left ear and throat for which she was prescribed Claritin-D.

An MRI and x-rays of the claimant's spine were obtained on November 16, 2010.[21]  The x-rays showed disc space narrowing with anterior spondylosis at C4-5, C5-6, and C6-7 and facet arthropathy at the lower three lumbar levels.  The MRI of the cervical spine showed slightly more neural foraminal narrowing on the left at C5-6 than on the prior MRI, while the MRI of the lumbar spine showed bilateral facet arthropathy at the lower three lumbar levels and a probable hemorrhagic cyst in the right hemipelvis, for which further evaluation was recommended.

The claimant first consulted with Dr. Lisa S. Thibodeaux of the Southeast Neuroscience Center in Houma, Louisiana, on November 22, 2010.[22]  She reported generalized body pain plus neck pain radiating to the scapula and sometimes to the head; tingling of the right medial calf, foot, and toes; shooting pain from the knees and elbows; muscle spasms in her chest; bruises; a history of rashes; and an overall sense of fatigue or malaise.  Based on these symptoms, Dr. Thibodeaux suspected that the claimant might have Raynaud's phenomenon (a disorder of the blood vessels) or

---

[20]     Rec. Doc. 8-1 at 395-397.

[21]     Rec. Doc. 8-1 at 366, 368-369, 497-502.

[22]     Rec. Doc. 8-1 at 487-489, 373-374.

a connective tissue disease such as lupus.  She ordered an EMG of the right upper and lower extremities, prescribed Zanaflex for back and neck pain, referred the claimant to a rheumatologist, and referred her to an OB/GYN for the cystic lesion in the pelvis and history of endometriosis.  The EMG study was mildly abnormal, possibly representing early carpal tunnel syndrome on the right.[23]

Rheumatologist Dr. Jerald Zakem wrote to Dr. Thibodeaux on November 26, 2010,[24] explaining that he had ordered testing, assessed the claimant with intermittent myalgias of uncertain etiology, and prescribed Orphenadrine (for muscle pain).

The claimant saw Dr. Thibodeaux again on December 30, 2010,[25] reporting that she was unable to take Zanaflex during the day time because it made her too sleepy. She complained of a sticking, stabbing pain in her thoracic spine and explained that the cystic lesion in her pelvis had been addressed by her OB/GYN.[26]  The doctor's impressions were cervical and lumbar spondylosis without myelopathy, thoracic spine pain, and generalized body pain (question fibromyalgia).  She continued Zanaflex,

---

[23]     Rec. Doc. 8-1 at 490-492.

[24]     Rec. Doc. 8-1 at 435-436.

[25]     Rec. Doc. 8-1 at 375, 484-486.

[26]     The claimant saw Dr. Shontell Thomas at Ochsner on August 8, 2011 for an endometrial biopsy, which was negative, and a mammogram on August 18, 2011 was also normal. (Rec. Doc. 8-1 at 388-389, 398, 420-421.)

added Lyrica, referred the claimant to physical therapy, ordered an MRI of the thoracic spine, and considered future epidural steroid injections.

The claimant saw Dr. McAllister on January 11, 2011,[27] with a chief complaint of neck pain radiating to her right arm and numbness in her right hand.  He noted that there was arthritis at C5-6 but no findings to support surgical intervention in her neck or lumbar spine.  His impressions were cervical spondylosis without myelopathy and right carpal tunnel syndrome.

An MRI of the thoracic spine obtained on January 13, 2011[28] showed multiple benign-appearing hemangiomas.  On January 27, 2011,[29] Dr. Thibodeaux noted that the hemangiomas could be contributing to the pain syndrome.  Dr. Thibodeaux noted that the rheumatologist had ruled out rheumatologic disease.  A whole body bone scan was ordered, trials of Cymbalta and Ryzolt were ordered, and the claimant was to continue physical therapy and Lyrica.  Dr. Thibodeaux also recommended light duty work with no lifting of anything heavier than ten pounds.  The whole body bone scan of February 4, 2011 showed no abnormality of the spine.[30]

---

[27]     Rec. Doc. 8-1 at 358-360.

[28]     Rec. Doc. 8-1 at 496.

[29]     Rec. Doc. 8-1 at 378, 481-483.

[30]     Rec. Doc. 8-1 at 495.

The claimant saw Dr. Thibodeaux on February 17, 2011.[31]  In addition to complaints of generalized body pain and localized thoracic pain, she also complained of pain in both elbows with shooting pains into her arms.  She reported that she was unable to take Ryzolt, Cymbalta, and Lyrica because they make her drowsy and do not relieve her pain.  Those medications were discontinued, and Savella was started.

The claimant saw Dr. Thibodeaux again on March 17, 2011.[32]  She complained of generalized body pain, spine and neck pain radiating to her shoulders, thoracic spine pain related to vertebral hemangiomas, joint pain particularly in the elbows, intermittent left leg numbness mostly when sitting for long periods, sticking pains in the upper back and chest, fatigue, and cold hands.  She reported that Savella gave her a 25% benefit and that Ibuprofen helped a lot.  The plan was to continue Savella, add Mobic, refer her back to rheumatology, and check her cardiac functioning to rule out heart problems related to her complaints of chest pain and fatigue.

An echocardiograph on March 28, 2011 showed mild tricuspid regurgitation but otherwise normal findings.[33]

---

[31]     Rec. Doc. 8-1 at 377, 478-480.

[32]     Rec. Doc. 8-1 at 378, 475-477.

[33]     Rec. Doc. 8-1 at 494.

On March 31, 2011,[34] the claimant again saw Dr. Zakem.  He noted that her test results were negative and diagnosed her with fibromyalgia and costochondritis, increased her Savella dosage, added Zanaflex as a muscle relaxant, and advised her to take Tylenol or Ibuprofen for pain and to apply heat to painful areas.

The claimant saw Dr. Thibodeaux on May 30, 2011.[35]  She reported that her pain was worse in the morning and that her medications "seem to be significantly assisting her with pain control," with Tramadol more effective than Mobic.  She reported that she was having increasing difficulty working due to the physical nature of her job, her decreased stamina, and her increased pain.  Dr. Thibodeaux found a full range of motion in the claimant's neck, but increased muscle spasms.  The doctor's impression was fibromyalgia, and her plan was to continue Savella, replace Mobic with Tramadol, refer the patient to cardiology, and consider a functional capacity evaluation through physical therapy for work status.

The claimant saw Dr. Zakem on July 19, 2011.[36]  He noted a full range of motion in all joints, no soft tissue swelling, redness, or increased warmth.  Multiple areas were tender to palpation especially across the chest wall.  Dr. Zakem's

---

[34]     Rec. Doc. 8-1 at 391-392.

[35]     Rec. Doc. 8-1 at 379, 472-474.

[36]     Rec. Doc. 8-1 at 390.

assessment was fibromyalgia, chest wall pain, and chronic headaches.  He increased the Tizanidine dosage.

The claimant returned to Dr. Thibodeaux on September 8, 2011.[37]  She had stopped taking Savella due to the cost but was still taking Lyrica.  She stated that Tramadol "has not really been helpful."  She reported that Dr. Zakem had added Zanaflex to help her sleep at night.  The doctor's impressions were fibromyalgia and thoracic pain secondary to hemangiomas.  Her plan was to continue Lyrica and Zanaflex, add Silenor for sleep, add Lortab in place of Tramadol for back pain, and schedule thoracic epidural steroid injections.  Bilateral facet injections at T6-7 and T7-8 were administered on September 14, 2011,[38] and a second set of injections were administered on September 21, 2011.[39]

Dr. Scott C. Chapman examined the claimant on September 20, 2011 at the request of Disability Determination Services.[40]  The claimant reported diagnoses of fibromyalgia, arthritis, neuropathy, degenerative disc disease, chronic headache, mitral valve prolapse, and depression and prescriptions of Silenor, Cymbalta, Lyrica,

---

[37]     Rec. Doc. 8-1 at 469-471.

[38]     Rec. Doc. 8-1 at 466-468.

[39]     Rec. Doc. 8-1 at 463-465.

[40]     Rec. Doc. 8-1 at 402-408.

Ibuprofen, Ryzoten, Nexium, Tramadol, Tizanidine, and Orphenadrine.  She stated that her depression might be due to her medications and that her medications had only been partially successful in treating her symptoms.  She reported a closed head injury at age nine, and an associated lifelong problem with headaches.  Upon examination, Dr. Chapman found soft tissue tenderness to palpation over the bilateral thighs and bilateral upper arms, severe tenderness to palpation over the mid thoracic spine and lower sternum as well as diffuse tenderness to palpation over both shoulders, and painful range of motion in the left knee.  The claimant's reflexes and strength were normal and she had a normal range of motion in all joints.  Grip strength in both hands was 3+/5, her gait was normal, and she could heel and toe walk.  A chest x-ray showed degenerative changes of the upper rib cage.  X-rays of the thoracic spine showed a mild curvature of the spine to the right.  Dr. Chapman's impressions were fibromyalgia neuropathy, degenerative disc disease of the thoracic spine, chronic headaches, mitral valve prolapse, and depression.  Dr. Chapman opined that the claimant should regularly see a cardiologist.  He also noted that "[t]he patient will have significantly decreased physical capabilities secondary to the fibromyalgia, the neuropathy, and the degenerative disc disease of the thoracic spine."

The claimant returned to Dr. Thibodeaux on December 6, 2011,[41] complaining of recurrent thoracic spine pain.  She reported that Ryzolt was helpful and that the injections had helped, but due to insurance issues she was unable to proceed with the third set.   She also complained of urinary frequency and constipation.   Dr. Thibodeaux found tenderness to palpation over the mid thoracic spine at the location of the T7 vertebral hemangioma.  The doctor's plan was to repeat the facet injections for pain management, continue the Ryzolt, Lyrica, and Zanaflex, obtain an ultrasound of the bladder, consider using Baclofen for spine pain and spasmodic bladder, and she recommended Miralax for constipation.

On December 12, 2011, the claimant had the first set in a second series of bilateral facet injections at T6-7 and T7-8.[42]  The second set of injections were administered on December 19, 2011;[43] and the third set were administered on December 28, 2011.[44]  A bladder ultrasound was performed on December 13, 2011.[45]

---

[41]     Rec. Doc. 8-1 at 460-462.

[42]     Rec. Doc. 8-1 at 457-459.

[43]     Rec. Doc. 8-1 at 454-456.

[44]     Rec. Doc. 8-1 at 451-453.

[45]     Rec. Doc. 8-1 at 493.

The claimant saw Dr. Zakem on January 4, 2012.[46]  She reported good and bad days, with pain worsened by activity and cold weather.  She was doing somewhat better since an increase in Zanaflex, and was no longer taking Savella.  He found that she was tender to palpation along the thoracic spine but had a good range of motion in the thoracic and lumbar spine.

On January 17, 2012,[47] the claimant told Dr. Thibodeaux that her pain decreased following the facet injections but was returning.  She had discontinued Lyrica but wanted to get back on it.  She reported hallucinations on Tizanidine, which the doctor noted was not an uncommon side effect.  It was noted that Tramadol was "a good medication for her."  Her medications were adjusted, including a prescription for Lortab for breakthrough pain.

The claimant telephoned Dr. Thibodeaux's office on February 8, 2012,[48] complaining of throbbing pain with activity and on and off pain in her neck and shoulders.  Ryzolt was prescribed.

---

[46]     Rec. Doc. 8-1 at 429.

[47]     Rec. Doc. 8-1 at 448-450, 659-662.

[48]     Rec. Doc. 8-1 at 550-551.

The claimant was seen at Ochsner on March 14, 2012, complaining of abdominal pain and nausea.[49]  Zantac was prescribed, and she was advised to discontinue all nonsteroidal anti-inflammatory drugs and get further testing.

The claimant returned to Dr. Thibodeaux on March 16, 2012,[50] complaining of localized neck pain radiating from the right side of the neck into the shoulder and scapular region and sometimes into her arm.  Medication difficulties were discussed, and her medications were adjusted.  She was prescribed a Butrans patch and Lyrica. The diagnoses were fibromyalgia, thoracic hemangioma, and cervical radiculopathy.

The claimant visited Dr. Thibodeaux on April 16, 2012,[51] reporting right hand pain and swelling two weeks earlier.  She also complained of worsening neck pain and pain radiating down the neck and arm upon turning her head a certain way as well as continued left-sided thoracic pain.  She stated that she did not start the Butrans due to a GI workup by endoscopy that showed inflammation.  Dr. Thibodeaux noted that the Butrans patch was prescribed for the purpose of providing an analgesic that did not go through the GI tract, hopefully resolving her GI issues.  Dr. Thibodeaux diagnosed cervical radiculopathy, fibromyalgia, and back pain in the thoracic region.

---

[49]     Rec. Doc. 8-1 at 425-426.

[50]     Rec. Doc. 8-1 at 444-447, 657, 667-668.

[51]     Rec. Doc. 8-1 at 442-443, 645-651.

Her plan was to obtain another MRI of the cervical spine, obtain an EMG of the right arm, and consider cervical traction and a cervical nerve root block series if necessary.

An MRI of the cervical spine on April 24, 2012 showed mild central canal narrowing at C4-5 and C5-6 as well as neural foraminal narrowing at multiple levels of the cervical spine.[52]  Contemporaneous cervical spine x-rays showed spondylosis with facet arthropathy at C4-5, 5-6, and 6-7.

On May 17, 2012, the claimant's Silenor prescription was replaced with Doxepin due to cost.[53]

The claimant again saw Dr. Thibodeaux on June 19, 2012.[54]  She said she did not pursue the recommended EMG because her right arm pain resolved.  She also reported that she had tripped and fallen on her right side a few days earlier.  She complained of shooting pains in the right knee and ankle as well as a tender spot on her forehead.  She also reported more overall pain since the fall.  Neurological and musculoskeletal examinations of the right leg were normal. The Butrans patch for pain management and the Lyrica for fibromyalgia were continued.  Melatonin was

---

[52]      Rec. Doc. 8-1 at 672-673.

[53]      Rec. Doc. 8-1 at 540-543.

[54]      Rec. Doc. 8-1 at 637-642.

substituted for Doxepin, which was causing weight gain.  The claimant was referred to physical therapy but she did not schedule it due to financial considerations.[55]

When the claimant saw Dr. Thibodeaux on October 25, 2012,[56] she had taken herself off of both Butrans and Lyrica, and Dr. Thibodeaux suspected that was why she was reporting increased pain.  It was noted that the claimant had previously been referred to cardiology, but did not go, and was now willing to do so because of recent chest pain.  Lyrica was restarted for fibromyalgia, and Zanaflex and Ibuprofen were continued for pain management.  Dr. Thibodeaux noted that a trigger point injection series might be helpful due to multiple trigger points identified on examination.  The claimant was referred to cardiology.

The claimant saw Dr. Kenneth Wong at the Cardiovascular Institute in Morgan City on November 1, 2012, and a series of diagnostic tests were performed.[57]  The claimant also saw Dr. Thibodeaux the same day[58] for the first in a series of trigger point injections in the bilateral cervical paraspinal, upper trapezii muscles, and upper thoracic paraspinals.  On November 8, 2012, the claimant reported that the initial

---

[55]     Rec. Doc. 8-1 at 635, 693.

[56]     Rec. Doc. 8-1 at 535-537, 628-633, 666.

[57]     Rec. Doc. 8-1 at 684-692.

[58]     Rec. Doc. 8-1 at 619-627.

trigger point injections helped a little, and the second in the series of injections was administered by Dr. Thibodeaux.[59]   The third set of trigger point injections was administered on November 16, 2012.[60]

That same day, the claimant followed up at the Cardiovascular Institute, and a sleep study was ordered,[61] which showed mild positional obstructive sleep apnea.[62]

On December 18, 2012, the claimant called Dr. Thibodeaux's office complaining of thoracic pain, and a prescription for Tramadol was called in to her pharmacy.[63]   The claimant saw Dr. Thibodeaux again on January 24, 2013.[64]   Dr. Thibodeaux noted that the claimant was unable to tolerate the Butrans patches, was continuing to take Zanaflex and Ibuprofen, but had stopped taking Lyrica.   The claimant complained of left-sided sharp neck pain, right elbow pain, right buttock pain, and right shin pain as well as mid thoracic spine pain.   She also complained of a choking sensation when waking up from sleep.   The claimant said the trigger point injections had helped, but the thoracic facet injections may have helped more.   The

---

[59]   Rec. Doc. 8-1 at 612-618.

[60]   Rec. Doc. 8-1 at 603-611.

[61]   Rec. Doc. 8-1 at 679-980.

[62]   Rec. Doc. 8-1 at 675-678.

[63]   Rec. Doc. 8-1 at 528-530.

[64]   Rec. Doc. 8-1 at 595-601.

diagnoses assigned were fibromyalgia, back pain in the thoracic region, hemangioma, cervicalgia, and unspecified musculoskeletal disorder with symptoms referable to the neck.  The doctor's plan was to restart Lyrica, continue Zanaflex and Ibuprofen, consider repeating the thoracic facet injections or the cervical trigger point injections, and have the claimant use a TENS unit.

When the claimant returned to Dr. Thibodeaux on April 26, 2013,[65] she stated that she did not restart Lyrica due to concern over mood issues but was willing to try Cymbalta, which she had used in the past.  In response to her report that she was found to have no cardiac issues, Dr. Thibodeaux noted her suspicion that the chest pain was part of the fibromyalgia-type pain.  The same diagnoses were assigned, and the plan was to restart Cymbalta, continue Zanaflex and Ibuprofen, and consider repeat thoracic facet injections.

The claimant saw Dr. Thibodeaux on May 29, 2013[66] for the first in another series of facet block injections bilaterally at T6-7 and T7-8.  The second set of

---

[65]     Rec. Doc. 8-1 at 519-520, 588-594.

[66]     Rec. Doc. 8-1 at 579-587.

injections in this series was administered on June 5, 2013,[67] and the third set was administered on June 12, 2013.[68]

The claimant followed up with Dr. Thibodeaux on July 24, 2013,[69] complaining of multifocal pain including shooting pains in the elbow, chest wall, and under her feet as well as left-sided neck tightness.  She stated that the thoracic facet injections had helped but were wearing off.  She had not filled the Lyrica prescription and had stopped taking Cymbalta due to the cost.  She could not afford the TENS unit, and she stated that Tramadol was no longer working.  She complained of increased urinary frequency, which Dr. Thibodeaux noted is often associated with fibromyalgia. Examination revealed thoracic paraspinal and upper trapezii muscle spasms as well as tenderness or trigger points in the right elbow, right buttock, and right shin.  Dr. Thibodeaux changed Lyrica to Gabapentin, continued Zanaflex and Ibuprofen, changed the Lortab dosage, referred the claimant to urology, considered repeating imaging studies, and considered repeating thoracic facet injections.

On November 24, 2013, Dr. Anthony S. Ioppolo of the Advanced Spine Institute in Baton Rouge, Louisiana, prepared a report for Disability Determination

---

[67]     Rec. Doc. 8-1 at 570-578.

[68]     Rec. Doc. 8-1 at 563-569.

[69]     Rec. Doc. 8-1 at 509-513, 557, 562, 663.

Services regarding his examination of the claimant on October 24, 2013.  The claimant gave a history of fibromyalgia, pain all over her body including headaches and pain in her elbows, knees, feet, chest, and back.  She stated that she was treating with a neurologist, had seen a rheumatologist, and had seen a cardiologist for a heart murmur.  She complained of difficulty sleeping due to pain and stated that she is depressed.  She reported taking Lortab, Ibuprofen, Tizanidine, and Sumatriptan.  Dr. Ioppolo found that she had neck pain on motion of the head in all directions but no atrophy, weakness, or fasciculation (brief spontaneous muscle contractions) in her shoulders and upper extremities.  Her deep tendon reflexes were normal.  Sensation was intact throughout her upper extremities and hands.  He observed that she walked with a painful gait and limp.  The claimant complained of pain on palpation over the lumbar spine and on flexion and extension of the back.  The straight leg test and Patrick's test were negative.  The musculature of the lower part of her body was not atrophied, and there was no fasciculations or loss of strength.  Deep tendon reflexes and sensation were normal.

In connection with his examination of the claimant, Dr. Ioppolo completed a medical source statement, in which he opined regarding the claimant's functional

capabilities.[70]  In his opinion, the claimant could lift and carry up to ten pounds without restriction, lift and carry eleven to twenty pounds frequently, but never lift or carry more than twenty pounds.  In his opinion, she was capable of sitting for two hours at a time and capable of standing or walking for one hour at a time.  He further found her capable of sitting for no more than four hours in a work day, standing for no more than three hours in a work day, and walking for no more than two hours in a workday.  He found her capable of frequently using her hands for reaching, handling, fingering, and feeling except that she could push/pull with both hands only occasionally.  He found that she could operate foot controls with either foot frequently.  In his opinion, she could occasionally climb stairs and ramps but never climb ladders or scaffolds, balance, stoop, kneel, crouch, crawl, or work at unprotected heights.  He also noted that she could not walk a block at a reasonable pace on rough or uneven surfaces.

At the hearing in 2012, the claimant testified that her medications did not fully relieve her symptoms and made her drowsy, dizzy, and unable to function as normal.[71]

---

[70]     Dr. Ioppolo's medical source statement appears to be dated October 24, 2011, but its context in the record indicates that it was actually prepared contemporaneously with his examination of the claimant and the preparation of his report in 2013.  In his second ruling, the ALJ referred to Dr. Ioppolo's statement as being dated 2011 (Rec. Doc. 8-1 at 25), but there is no reference to the statement in the May 2012 ruling.  Surely, the ALJ would have referred to the statement if it had been in the record at that time.

[71]     Rec. Doc. 8-1 at 42.

She estimated that she could walk for an hour, stand no longer than an hour, sit for three to four hours, and lift ten pounds.[72]   She stated that she did a little housework, a little laundry, and a little shopping.[73]   At the 2014 hearing, the claimant again testified that her medications made her drowsy and dizzy.[74]   She estimated that she could walk for an hour, stand for fifteen minutes, sit for thirty minutes, and lift two or three pounds.[75]   She denied doing any housework, laundry, or shopping, claiming that friends and family do those tasks for her.[76]

## ANALYSIS

### A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[77]   "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as

---

[72]      Rec. Doc. 8-1 at 42-43.

[73]      Rec. Doc. 8-1 at 43.

[74]      Rec. Doc. 8-1 at 76.

[75]      Rec. Doc. 8-1 at 76-77.

[76]      Rec. Doc. 8-1 at 77.

[77]      *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

a reasonable mind might accept as adequate to support a conclusion."[78]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[79]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[80]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[81]   Conflicts in the evidence[82] and credibility assessments[83] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's

---

[78]     *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[79]     *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[80]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[81]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[82]     *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[83]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

-23-

subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[84]

**B.    ENTITLEMENT TO BENEFITS**

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[85]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[86]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[87]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and

---

[84]       *Wren v. Sullivan*, 925 F.2d at 126.

[85]       See 42 U.S.C. § 423(a).

[86]       42 U.S.C. § 1382(a)(1) & (2).

[87]       42 U.S.C. § 1382c(a)(3)(A).

work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[88]

## C.   EVALUATION PROCESS AND BURDEN OF PROOF

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  This process requires the ALJ to determine whether the claimant (1) is currently working; (2) has a severe impairment; (3) has an impairment listed in or medically equivalent to those in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) is able to do the kind of work he did in the past; and (5) can perform any other work at step five.[89] "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."[90]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[91] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the

---

[88]     42 U.S.C. § 1382c(a)(3)(B).

[89]     20 C.F.R. § 404.1520.

[90]     *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[91]     20 C.F.R. § 404.1520(a)(4).

record.[92]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[93]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[94]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[95]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[96]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[97]

---

[92]     20 C.F.R. § 404.1545(a)(1).

[93]     20 C.F.R. § 404.1520(e).

[94]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[95]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[96]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[97]     *Greenspan v. Shalala*, 38 F.3d at 236.

-26-

D.   THE ALJ'S FINDINGS AND CONCLUSIONS

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since May 18, 2011, the alleged disability onset date.[98] This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  fibromyalgia and mild degenerative changes of the cervical, lumbar, and thoracic spine.[99]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[100]  The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform sedentary work except that she should be limited to sitting for thirty minutes at a time.[101]  The claimant challenges this finding.

---

[98]     Rec. Doc. 8-1 at 22.

[99]     Rec. Doc. 8-1 at 22.

[100]    Rec. Doc. 8-1 at 23.

[101]    Rec. Doc. 8-1 at 24.

At step four, the ALJ found that the claimant is not capable of performing her past relevant work as a bartender, housekeeper, and playroom attendant.[102]   The claimant does not contest this finding.

At step five, the ALJ found that the claimant was not disabled from May 18, 2011 through July 3, 2014 (the date of the decision) because there are jobs in the national economy that she can perform.[103]   The claimant challenges this finding.

## E.   THE ALLEGATIONS OF ERROR

Ms. Waterman claims that the ALJ erred (1) in his assessment of the medical evidence postdating the Appeals Council's remand of this matter particularly with regard to the claimant's fibromyalgia; (2) because substantial evidence does not support his decision; and (3) because he relied on vocational expert testimony that did not fully incorporate all of the claimant's limitations.   This Court interprets these assignments of error as addressing (a) whether the ALJ used the proper methodology at step three, and (b) whether the ALJ's residual functional capacity finding was supported by substantial evidence.

---

[102]      Rec. Doc. 8-1 at 27.

[103]      Rec. Doc. 8-1 at 28-29.

**F.**   **D**ID THE **ALJ P**ROPERLY **E**VALUATE THE **P**OST-**H**EARING **E**VIDENCE AND THE **C**LAIMANT'S **F**IBROMYALGIA AS **S**TEP **T**HREE?

After the first hearing, the Appeals Council granted the claimant's request for review and ordered that additional evidence concerning the claimant's impairments be obtained.[104]   The record now contains treatment notes from the claimant's visits with her treating neurologist during 2013 and the report prepared by a consulting neurosurgeon, Dr. Ioppolo, following his examination of the claimant.  Additionally, a medical expert, Dr. George Smith, testified at the second hearing.  The claimant contends, however, that the ALJ failed to properly evaluate that new evidence.  The claimant also contends that the ALJ failed to evaluate the medical evidence in light of SSR 12-2P, which established guidelines for the evaluation of fibromyalgia.

The plaintiff was diagnosed with fibromyalgia, and her primary complaint is pain in various parts of her body.  The ALJ found that her fibromyalgia is a severe impairment but further found that it does not meet or equal a listing.  The claimant argues that this conclusion was erroneous for three reasons:  because the ALJ failed to evaluate the claimant's fibromyalgia in accordance with SSR 12-2p, gave great weight to the opinions of Dr. George Robert Smith who testified at the second hearing, and used a "pick and choose" method to evaluate the evidence in the record.

---

[104]   Rec. Doc. 8-1 at 124.

Fibromyalgia is not a listed impairment.  Therefore, the ALJ did not err in finding that the claimant's fibromyalgia does not meet a listing.  As stated in SSR 12-2p, "FM [fibromyalgia] cannot meet a listing in appendix 1 because FM [fibromyalgia] is not a listed impairment."[105]

However, fibromyalgia can provide the basis for a finding of disability,[106] and SSR 12-2p suggests that evaluating a claimant's fibromyalgia under Listing 14.09(D) for inflammatory arthritis would be a suitable method for determining whether a claimant's fibromyalgia equals a listing.  The regulation does not require that fibromyalgia be evaluated only under that listing.  In this case, however, the ALJ did not evaluate the claimant's symptoms in light of Listing 14.09(D) or in light of any other listing, nor did the ALJ properly evaluate the claimant's symptoms under SSR 12-2p or even mention that regulation in his ruling.  This was error.

Similarly, although the ALJ found that the claimant's "mild degenerative changes of the cervical, lumbar[,] and thoracic spine" is a severe impairment,[107] he did not explain why that condition does not meet or equal a listing.  Instead, he simply stated that "[w]hile claimant has some orthopedic impairments, they do not cause

---

[105]     SSR 12-2p, 2012 WL 3104869, at *6.

[106]     SSR 12-2p, 2012 WL 3104869, at *2.

[107]     Rec. Doc. 8-1 at 23.

-30-

severe limitations."[108]  This statement is inconsistent with the ALJ's finding that the claimant's spine condition is severe.

The ALJ reached his conclusion that the claimant's impairments do not meet or equal a listing without identifying the listings he considered and without any comparison of the claimant's symptoms or clinical findings with the criteria of any relevant listing.  This is insufficient because an "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[109]  More particularly, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[110]

In *Audler v. Astrue*, the ALJ concluded that the medical evidence in the record indicated that the claimant had impairments that were severe but not severe enough to meet or medically equal a listed impairment.  The Fifth Circuit Court of Appeals noted that "[t]he ALJ did not identify the listed impairment for which Audler's

---

[108]     Rec. Doc. 8-1 at 23.

[109]     *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[110]     *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

symptoms fail to qualify, nor did she provide any explanation as to how she reached the conclusion that Audler's symptoms are insufficiently severe to meet any listed impairment."[111]  The Fifth Circuit concluded that "[s]uch a bare conclusion is beyond meaningful judicial review."[112]  The court then went on to explain that:

> By the explicit terms of the statute [42 U.S.C. § 405(b)(1)], the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."[113]

In this case, the ALJ failed to follow the Fifth Circuit's guidelines in evaluating the claimant's impairments, summarily stating that "an impartial medical expert testified that the claimant's impairments do not meet or equal a listed impairment."[114]  A review of the hearing transcript reveals that, like the ALJ, the medical expert also failed to identify any particular listing that he might have consulted in analyzing the claimant's impairments.  Therefore, it appears that the ALJ merely repeated the

---

[111]    *Audler v. Astrue*, 501 F.3d at 448.

[112]    *Audler v. Astrue,* 501 F.3d at 448, quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996).

[113]    *Audler v. Astrue*, 501 F.3d at 448, quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986).

[114]    Rec. Doc. 8-1 at 23.

medical expert's opinion without actually analyzing whether the claimant's impairments meet or equal a listed impairment.

In accordance with the Fifth Circuit's reasoning, the Commissioner's step three determination in this case was not reached through the application of proper legal standards and the undersigned is unable to determine whether the Commissioner's conclusion at step three is or is not based on substantial evidence in the record. Because the ALJ failed to compare the claimant's symptoms with those of relevant listings, remand is required.[115]   Therefore, the undersigned recommends that this matter be remanded for a thorough analysis of whether the claimant has an impairment or combination of impairments that meets or medically equals a listed impairment.

## G.   IS THE ALJ'S RESIDUAL FUNCTIONAL CAPACITY FINDING SUPPORTED BY SUBSTANTIAL EVIDENCE?

The claimant argues that the ALJ's residual functional capacity finding fails to account for all of her functional limitations and is not supported by substantial

---

[115]   See, e.g., *Reyna v. Colvin*, No. 5:14-CV-147-C, 2015 WL 1515251, at *4 (N.D. Tex. Apr. 1, 2015); *Marsh v. Comm'r of Soc. Sec. Admin.*, No. 4:13CV312, 2015 WL 1288656, at *3 (E.D. Tex. Mar. 20, 2015) *Watson v. Colvin*, No. 3:13-CV-583-BF, 2014 WL 1281473, at *4 (N.D. Tex. Mar. 31, 2014); *Joseph v. Astrue*, No. 6:10-CV-01315, 2012 WL 601477, at *6 n. 74 (W.D. La. Jan. 24, 2012) report and recommendation adopted, No. 6:10-CV-01315, 2012 WL 601586 (W.D. La. Feb. 22, 2012); *Robertson v. Astrue*, No. 3-10-CV-1669-BD, 2011 WL 3836915, at *4 (N.D. Tex. Aug. 26, 2011); *Lynch v. Astrue*, No. 7–10–CV–0032–BD, 2011 WL 1542056 at *3–4 (N.D.Tex. Apr.22, 2011).

evidence in the record.   More particularly, the claimant argues that the ALJ improperly rejected Dr. Ioppolo's opinions regarding her residual functional capacity and relied instead upon the vocational expert's response to a hypothetical question that did not incorporate all of the claimant's impairments.

The responsibility for determining a claimant's residual functional capacity belongs to the ALJ.[116]  In making a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical and mental limitations.[117]

The record contains only two functional analyses.   The first is Dr. Thibodeaux's recommendation on January 27, 2011 that the claimant be limited to light duty work with no lifting of anything heavier than ten pounds.[118]  The second is Dr. Ioppolo's statement, in which he implicitly opines that the claimant is unable to perform sedentary work, which requires that a person be able to sit for a total of six hours out of an eight-hour work day,[119] because, in his opinion, the claimant cannot

---

[116]     *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[117]     *Martinez v. Chater*, 64 F.3d at 176.

[118]     Rec. Doc. 8-1 at 483.

[119]     Soc. Sec. Rul. 83–10, 1983 WL 31251, at *5.

sit for more than four hours per day.  The ALJ gave no weight to Dr. Ioppolo's statement "as it is not consistent with the objective testing and overall evidence of records."[120]  The ALJ further explained that Dr. Ioppolo's physical examination of the claimant showed no muscle atrophy, a negative Patrick's test, and an ability to walk on tiptoes and heels while barefooted.  He concluded that if the claimant were as functionally limited as Dr. Ioppolo's statement suggests, "physical examination would have shown some abnormalities,"[121] discounting the claimant's complaints of pain, her fibromyalgia diagnosis, and the objective testing that showed she has a hemangioma at T7 and degenerative changes in her cervical spine and lumbar spine.

The ALJ gave great weight to the opinions of Dr. Smith, who testified at the second hearing, and adopted without further analysis Dr. Smith's opinion that the claimant does not have an impairment that meets or equals a listing.  At the hearing, Dr. Smith acknowledged Dr. Ioppolo's opinions concerning the amount of time that the claimant can sit, stand, and walk in a day.[122]  Dr. Smith did not offer an opinion disagreeing with Dr. Ioppolo's opinions, and he expressly stated that he agreed with

---

[120]     Rec. Doc. 8-1 at 26.

[121]     Rec. Doc. 8-1 at 26.

[122]     Rec. Doc. 8-1 at 70.

Dr. Ioppolo's opinions concerning postural activities.[123]   The ALJ did not explain why he gave great weight to certain of Dr. Smith's opinions but not to all of his opinions.  More particularly, the ALJ did not explain why he discredited Dr. Smith's opinion concerning the claimant's residual functional capacity, especially since Dr. Ioppolo actually examined the claimant but Dr. Smith did not.

At the hearing, the claimant testified that she can only sit for about thirty minutes at a time, and the ALJ posed a hypothetical question to the vocational expert, in which he asked the expert to assume that the claimant had the ability to perform sedentary work but could sit for only thirty minutes at a time.  The expert found work that the hypothetical claimant could perform.  The ALJ then incorporated the thirty minute limit in his residual functional capacity finding.

The claimant challenges the ALJ's finding on the basis that, while it incorporates the thirty-minutes-at-a-time limitation based on the claimant's testimony, it fails to incorporate the four-hour-per-day limitation assigned by Dr. Ioppolo.  The challenge really does not hinge on the hypothetical question, however; it hinges on the ALJ's failure to accept Dr. Ioppolo's opinion concerning the limiting nature of the claimant's impairment.  The ALJ gave no weight to Dr. Ioppolo's opinions, stating that they are "not consistent with the objective testing and overall evidence of

---

[123]      Rec. Doc. 8-1 at 73-74.

records." In fact, however, Dr. Ioppolo's examination of the claimant yielded results wholly consistent with the record as a whole, and Dr. Smith stated that he had no quarrel with Dr. Ioppolo's opinions. Still, the ALJ declined to accept those opinions and substituted his own opinion regarding the claimant's residual function capacity for those of the consulting examiner – and those of Dr. Smith.

"Although the ALJ may weigh competing medical opinions about. . . limitations and use objective medical evidence to support its determination that one opinion is better founded than another, neither the ALJ nor the court is free to substitute its own opinion."[124] Thus, an ALJ errs when he substitutes his own judgment for that of the medical experts or rejects their opinions based on his own criteria.[125] In this case, Dr. Ioppolo's opinions were based on his examination of the claimant and his review of the claimant's medical records and diagnostic test results. Dr. Smith testified that he had no basis on which to object to Dr. Ioppolo's opinions. Therefore, the ALJ's failure to adopt those opinions can only be the result of his having substituted his own opinions for those of the physicians.

---

[124]    *Fabre v. Astrue*, No. 13-00076-BAJ-RLB, 2014 WL 4386424, at *6 n. 6 (M.D. La. Sept. 4, 2014).

[125]    *Williams v. Astrue*, 355 Fed. App'x 828, 832 (5th Cir. 2009), citing *Ripley v. Chater*, 67 F.3d at 557–58. See, also, *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

Accordingly, this Court finds that the ALJ failed to apply the proper legal standard in evaluating the claimant's residual functional capacity and, for that reason, cannot determine whether the ALJ's residual functional capacity finding is supported by substantial evidence in the record.  This mandates remand of the ALJ's decision.

## CONCLUSION AND RECOMMENDATION

For the reasons explained above, this Court recommends that the Commissioner's decision be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to determine whether the claimant's impairments meet or equal a listing and to again evaluate the claimant's residual functional capacity.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[126]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after

---

[126]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

-38-

receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[127]

Signed at Lafayette, Louisiana, on this 18th day of January 2017.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[127]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).